14-3123-cv
*CBS Broadcasting v. FilmOn.com Inc.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued:  August 31, 2015      Decided: February 16, 2016)

Docket No. 14-3123-cv

_____

CBS BROADCASTING INC., NBC STUDIOS, INC., UNIVERSAL NETWORK TELEVISION, LLC, NBC SUBSIDIARY (KNBCTV), INC., TWENTIETH CENTURY FOX FILM CORPORATION, FOX TELEVISION STATIONS, INC., ABC HOLDING COMPANY, INC., DISNEY ENTERPRISES, INC., NBC STUDIOS LLC, NBC SUBSIDIARY (KNBCTV) LLC, AMERICAN BROADCASTING COMPANIES, INC., BIG TICKET TELEVISION, INC., CBS STUDIOS INC., OPEN 4 BUSINESS PRODUCTIONS LLC,

*Plaintiffs-Appellees,*

- v. -

FILMON.COM, INC.,

*Defendant-Appellant,*

ALKIVIADES DAVID,

*Respondent-Appellant.*

_____

Before:

HALL, LIVINGSTON, and LOHIER, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*) holding Defendant-Appellant FilmOn.com, Inc. and Respondent-Appellant Alkiviades David in contempt, sanctioning FilmOn.com, Inc. $90,000, and awarding Plaintiffs-Appellees attorneys' fees. Appellants argue that the district court abused its discretion when it held them in contempt because the injunction was not clear and unambiguous and they diligently attempted to comply with the injunction in a reasonable manner. Appellants further contend that the district court abused its discretion by imposing criminal sanctions and by awarding attorneys' fees. The district court did not abuse its discretion when holding both FilmOn.com, Inc. and David in contempt, sanctioning FilmOn.com, Inc., and awarding attorneys' fees.

AFFIRMED.

RYAN G. BAKER,
  Baker Marquart LLP, Los Angeles, CA, *for Defendant-Appellant FilmOn.com Inc. and Respondent-Appellant Alkiviades David*.

ROBERT ALAN GARRETT,
  Peter L. Zimroth (on the brief), Arnold & Porter LLP, New York, NY, *for Plaintiffs-Appellees CBS Broadcasting et al.*

  Julie A. Shepard and Paul M. Smith (on the brief), Jenner & Block LLP, Washington, DC, *for Plaintiffs-Appellees Twentieth Century Fox Film Corporation and Fox Television Stations, Inc.*

HALL, *Circuit Judge*:

FilmOn.com, Inc. ("FilmOn") and FilmOn's Chief Executive Officer, Alkiviades David ("David"), appeal from an August 15, 2014 judgment entered in the United States District Court for the Southern District of New York (Buchwald, *J.*) pursuant to a decision holding FilmOn and David in contempt of an August 8, 2012 Consent Order of Judgment and Permanent Injunction (the "Injunction"). The Injunction prohibited FilmOn from distributing copyrighted content owned by Plaintiffs-Appellees (collectively, the "Plaintiffs")—a group of television networks including CBS Broadcasting Inc., NBC Studios LLC, Fox Television Stations, Inc., and ABC Holding Company Inc. On July 7, 2014, the district court ordered FilmOn and David to show cause why the district court should not hold FilmOn in contempt for violating the Injunction because FilmOn had used its Teleporter technology ("Teleporter System") to distribute the Plaintiffs' copyrighted television programs without the Plaintiffs' permission. The district court found that FilmOn had violated the Injunction and held both FilmOn and David in civil contempt, sanctioned FilmOn $90,000, and awarded the Plaintiffs attorneys' fees. On appeal, FilmOn and David argue that the district court abused its discretion when it held them in contempt, sanctioned FilmOn,

and awarded the Plaintiffs attorneys' fees. For the reasons stated below, we affirm the district court's decision.

## I.    BACKGROUND

In 2010, FilmOn launched a service that allowed subscribers to use a computer or mobile device to stream an assortment of television stations over the Internet. The Plaintiffs sued FilmOn for copyright infringement and sought a temporary restraining order. In response, FilmOn argued that it was operating as a cable system and therefore it qualified for a Section 111 compulsory license under the Copyright Act, 17 U.S.C. § 111.[1] The district court granted the temporary restraining order, and in July 2012 the parties entered into a settlement agreement (the "2012 Settlement Agreement") which was executed by David in his personal capacity and on behalf of FilmOn. The district court

---

[1] Section 111(c)(1) of the Copyright Act provides that "secondary transmissions to the public by a cable system of a performance or display of a work embodied in a primary transmission made by a broadcast station licensed by the Federal Communications Commission ["FCC"] . . . shall be subject to statutory licensing." 17 U.S.C. § 111(c)(1). If the FCC determines that FilmOn is a cable system under the Copyright Act then FilmOn will qualify for a Section 111 license and be entitled to transmit the Plaintiffs' copyrighted content, subject to fees and restrictions imposed on Section 111 license holders.

approved the 2012 Settlement Agreement and then entered it as a stipulated consent judgment and the Injunction.

The Injunction prevents FilmOn and its "affiliated companies, and all of its officers, directors, agents . . . from infringing, by any means, directly or indirectly, any of plaintiffs' exclusive rights under Section 106(1)-(5) of the Copyright Act, including but not limited to through the streaming over mobile telephone systems and/or the Internet." App. 175. The injunction explicitly provides that any violation of its provisions would expose FilmOn to "all applicable penalties, including contempt of Court." *Id.*

After consenting to the Injunction, FilmOn began offering its subscribers a video on demand (VOD) service which allowed users to access an archive of previously televised programs for streaming at any time. In July 2013, the Plaintiffs sought an order to show cause why FilmOn should not be held in contempt for violating the Injunction. The district court found FilmOn and David in contempt for the unauthorized VOD streaming of the Plaintiffs' programming. The district court issued a contempt judgment ("2013 Contempt Judgment") that required defendants to agree not to use the VOD system to stream any of the Plaintiffs' copyrighted programming and to remove all broadcast programming

5

identified by the Plaintiffs. In addition, the 2013 Contempt Judgment awarded the networks $115,046.10 in attorneys' fees and provided that "any further failure to comply with the Injunction [] shall be punishable by a penalty of $10,000 per day of noncompliance." App. 269.

After the 2013 Contempt Judgment was entered, FilmOn X[2]—FilmOn's sister company—deployed a new Teleporter technology which FilmOn alleges was specifically designed to comply with the Injunction and this Circuit's decision in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") while still providing copyrighted content to users. In *Cablevision* we held that a remote storage DVR system allowing users to record and store programming on hard drives did not violate the public performance rights of copyright owners. *Id.* at 140. FilmOn's Teleporter System leveraged this remote storage DVR technology to allow consumers to view television content over the Internet at essentially the same time that the content was being broadcast over the airwaves.

---

[2] We refer to FilmOn.com, Inc. and FilmOn X collectively as "FilmOn" because FilmOn X is an "affiliated compan[y]" and is thus subject to the terms of the Injunction. App. 175.

Other companies began using similar technology in an attempt to comply with the law and to deliver copyrighted content to users over the Internet. The television networks challenged the use of this technology—this time by suing the company Aereo, Inc.—and this Court determined that the technology did not infringe upon the networks' copyrights because the technology was analogous to the technology in *Cablevision*. *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 696 (2d Cir. 2013) ("*Aereo II*"). Because FilmOn's Teleporter System is essentially the same as Aereo's technology, this decision arguably made clear that FilmOn could deploy its Teleporter System to distribute copyrighted material throughout the geographic scope of the Second Circuit.

In an attempt to prevent FilmOn from deploying this technology nationwide, the Plaintiffs filed copyright infringement actions in California and in the District of Columbia. The California District Court enjoined FilmOn from using the Teleporter technology within the Ninth Circuit, *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1151 (C.D. Cal. 2012), and on September 5, 2013, the D.C. District Court issued another injunction enjoining FilmOn from deploying the Teleporter technology nationwide, *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 52 (D.D.C. 2013). Due

to our decision in *Aereo II*, the D.C. District Court's nationwide injunction explicitly did not apply within the geographic boundaries of the Second Circuit. *Id*. After deployment of the Teleporter System within the First Circuit, the D.C. District Court held FilmOn in contempt for violating its order. The D.C. District Court warned that it would impose a fine of $20,000 per day for any further violations of the injunction, noting that FilmOn had once violated the underlying Injunction in this case. The D.C. Court's contempt order was never appealed.

On June 25, 2014, the Supreme Court, in *American Broadcasting Companies, Inc., v. Aereo, Inc.*, reversed this Court's decision that had arguably demarcated the Second Circuit as a safe haven for using the Teleporter technology. 134 S. Ct. 2498 (2014) ("*Aereo III*"). The Supreme Court agreed with the broadcast networks, including the Plaintiffs, that "Aereo 'performs' petitioners' copyrighted works 'publicly,' as those terms are defined in the Transmit Clause." *Id*. at 2511 (alteration omitted). The Court held that the use of the remote storage DVR technology constituted a public performance of the petitioners' protected programming and determined that Aereo's technology, which was previously permissible within the geographic scope of the Second Circuit, was now prohibited under the Copyright Act. *Id*. at 2507.

8

On June 28, 2014, a few days after the Supreme Court's decision in *Aereo III*, Aereo, Inc. ceased using the prohibited technology. FilmOn, however, continued to operate its Teleporter System throughout the Second Circuit. On July 3, 2014, the Plaintiffs filed the underlying Order to Show Cause. Four days later FilmOn canceled operations of its Teleporter System.

The Plaintiffs argue that, after the Supreme Court's decision in *Aereo III*, FilmOn violated the injunction by using its Teleporter System to broadcast the Plaintiffs' copyrighted content within the Second Circuit. The Plaintiffs also contend that FilmOn transmitted the copyrighted programming to regions outside the Second Circuit. The district court agreed with the television networks and held FilmOn and David in civil contempt, sanctioned FilmOn $90,000, and awarded attorneys' fees. This appeal followed.

## II.    DISCUSSION

### a.  FilmOn's Contempt Order

We first address whether the district court abused its discretion when it held FilmOn in contempt. "[B]ecause the power of a district court to impose contempt liability is carefully limited, our review 'of a contempt order for abuse-of-discretion is more rigorous than would be the case in other situations in which

9

abuse of discretion review is conducted.'" *E.E.O.C. v. Local 638*, 81 F.3d 1162, 1171 (2d Cir. 1996) (quoting *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir. 1995)). We review the district court's interpretation of the terms of a consent decree *de novo* and the factual findings that were the basis for the contempt order for clear error. *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003).

The contempt power serves to "protect[] the due and orderly administration of justice and [to] maintain[] the authority and dignity of the court." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner. *Paramedics Electromedicina Commercial, Ltd. v. GE Med Sys. Info. Techs. Inc.*, 369 F.3d 645, 655 (2d Cir. 2004).

The Injunction prohibits FilmOn, its "affiliated companies," "officers," and others:

> from infringing, by any means, directly or indirectly, any of plaintiffs' exclusive rights under Section 106 (1)-(5) of the Copyright Act including but not limited to

10

through the streaming over mobile telephone systems and/or the Internet of any of the broadcast television programming in which any plaintiff owns a copyright.

App. 144.

### i. Clear and Unambiguous

An injunction is sufficiently clear and unambiguous if it leaves "no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden." *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989). Here, a violation of the Injunction is conditioned on any violation of the Copyright Act. App. 144. Whether the Injunction is clear and unambiguous is thus directly related to whether the Plaintiffs' exclusive rights under the Copyright Act were clear and unambiguous. We hold that they were.

FilmOn, nevertheless, argues that the Injunction is unclear and ambiguous because the Plaintiffs' exclusive rights under the Copyright Act were in flux and were uncertain. In particular, FilmOn contends that *Aereo III* destroyed the state of clarity surrounding the Plaintiffs' copyrights and created confusion as to whether their Teleporter System now qualified for a Section 111 license. Given this confusion, it was unclear whether FilmOn's continued deployment of the Teleporter System would infringe on the Plaintiffs' rights. Because Aereo's

technology and FilmOn's technology are nearly identical, FilmOn argues that dicta in the *Aereo III* decision comparing Aereo to a cable company cast doubt on whether the current regulatory regime is properly classifying their technology.

FilmOn's arguments are unpersuasive. Regarding Section 111, we note that at no point in time has FilmOn obtained a Section 111 license. Although at some point in the future FilmOn's technology may eventually qualify for a Section 111 license, under the current law of the Second Circuit "Internet retransmission services do not constitute cable systems under § 111." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 284 (2d Cir. 2012) ("*ivi*").[3] And whatever future door *Aereo III* may have opened regarding Section 111 licensing, there is no doubt that the Supreme Court's holding explicitly slammed shut the possibility that FilmOn could continue deploying the Teleporter System throughout the Second Circuit, absent

---

[3] To the extent that *Aereo III* calls our holding in *ivi* into question, we note, as the district court did, that the Court in *Aereo III* did not address *ivi* or its holding and therefore it remains controlling precedent. *See United States v. Mason*, 412 U.S. 391, 395 (1973). We decline to speculate on whether the Supreme Court or the Federal Communications Commission will, in the future, determine whether this technology qualifies as a cable system under Section 111 of the Copyright Act, and we decline to revisit our holding in *ivi* absent a case or controversy that presents us with that issue. The issue before us is not whether FilmOn is entitled to a Section 111 license; it is whether the Plaintiffs' exclusive rights under the Copyright Act were clear and unambiguous so as to allow the district court to hold FilmOn in contempt for violating those rights.

a license, without violating the Copyright Act. *Aereo III* explicitly held that this type of technology "performed" petitioner's copyrighted works "publicly" and therefore violated the Copyright Act. *Aereo III* at 2511. The injunction, sufficiently clear and unambiguous on its own, became even more so after *Aereo III* such that there should have been "no doubt in the minds of those to whom it was addressed" that deploying the Teleporter System was "forbidden." *Drywall*, 889 F.2d at 395.

### ii. Clear and Convincing Proof of Noncompliance

The district court did not err when it determined that the proof of FilmOn's noncompliance was supported by clear and convincing evidence. *Aereo III* made clear that deploying the Teleporter System within the Second Circuit would violate the Plaintiffs' copyright. FilmOn admits that it deployed its Teleporter System in the Second Circuit between June 28, 2014 and July 7, 2014. This admission belies any claim of error.

### iii. Diligent Attempt to Comply in a Reasonable Manner

The district court also did not err when it found that FilmOn did not diligently attempt to comply with the Injunction in a reasonable manner. FilmOn correctly understood that *Aereo III* materially changed the Plaintiffs' exclusive

13

copyrights under the Injunction. FilmOn incorrectly took it upon itself to interpret that change. If FilmOn, being already subject to an injunction barring it from infringing the Plaintiffs' copyrights, wanted to ensure that it remained in compliance with the Injunction, it "could have petitioned the District Court for a modification, clarification or construction of the order." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). Instead, it "undertook to make [its] own determination" of what the Plaintiffs' rights were. *Id.* Rather than petitioning the district court for clarification, FilmOn issued a press release announcing its plans to file for a Section 111 license, to continue deploying the Teleporter System in New York and to expand its use nationwide.

Irrespective of whether FilmOn will eventually qualify for a Section 111 license, the fact that it applied for a license is not evidence that it acted in a reasonable manner under the circumstances. As noted above, FilmOn did not possess a Section 111 license at the time it deployed its Teleporter System, nor did it even apply for one until after the Plaintiffs filed the underlying Order to Show Cause. Moreover, because the district court had already rejected FilmOn's Section 111 argument before the Injunction was initially issued, the only prudent

14

decision would have been to approach the District Court and argue that the law had changed in FilmOn's favor. FilmOn took no such action.

Considering FilmOn's history of misreading changes in federal copyright law and being held in contempt for violating multiple federal injunctions both in this Circuit and in the D.C. Circuit, a response by FilmOn to the *Aereo III* decision that diligently attempted to comply with the Injunction should have included proceeding with caution. Rather than following Aereo Inc.'s lead and suspending operations, however, FilmOn cavalierly doubled down and continued deploying the Teleporter System throughout the Second Circuit with plans to expand. Although it is true that *Aereo III* may have altered the Plaintiffs' exclusive rights under the Copyright Act, FilmOn's response to this change was not a diligently reasonable attempt to comply with the Injunction under which it was already required to operate. We conclude that the district court did not abuse its discretion by holding FilmOn in civil contempt.

### b. David's Contempt Order

We next address whether the district court abused its discretion when it held Mr. David in contempt. The Injunction not only enjoins FilmOn but also "all of its officers, directors, agents, servants and employees." App. 175. A command

to a company is in "effect a command to those who are officially responsible for the conduct of its affairs." *NLRB v. Hopwood Retinning Co.*, 104 F.2d 302, 305 (2d Cir. 1939) ("*Hopwood*") (quoting *Wilson v. United States*, 221 U.S. 361, 376 (1911)). Even when corporate officers are not a party to the original action, if they "prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." *Hopwood*, 104 F.2d at 305.

According to his own statement opposing the district court's order, David had the ability to prevent FilmOn from deploying the Teleporter System. In addition, FilmOn's Chief Technology Officer, Mykola Kutovyy, stated in a declaration that David, as CEO, had previously directed him to limit the geographic scope in which the technology could function. This evidence supports the district court's conclusion that David both had the power to force FilmOn to comply and failed to "take appropriate action within [his] power" to prevent FilmOn from violating the injunction. *Id.* at 305. The district court did not abuse its discretion by holding David in contempt for FilmOn's violation of the injunction.

16

### c. Sanctions

We now turn to the issue of sanctions. We review the district court's award of sanctions for abuse of discretion. *United States v. Seltzer*, 227 F.3d 36, 39 (2d Cir. 2000) ("This Court reviews all aspects of a District Court's decision to impose sanctions for abuse of discretion." (internal quotation omitted)). A "court's interest in protecting the integrity of [a consent] decree justifies any reasonable action taken by the court to secure compliance." *NLRB v. Local 3, Int'l Bhd. of Elect. Workers*, 471 F.3d 399, 406 (2d Cir. 2006) ("*Local 3*") (quoting *United States v. Local 359*, 55 F.3d 64, 69 (2d Cir. 1995)). This "inherent power" to enforce a consent judgment extends "beyond the remedial contractual terms agreed upon by the parties." *Id*. (internal quotation omitted). This power, however, has limits. A district court cannot impose criminal sanctions without affording a defendant the constitutional procedural protections of a jury trial. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 837–38 (1994) ("*Bagwell*"). FilmOn argues that the district court imposed criminal sanctions which transformed the civil contempt into a criminal contempt, and thus that the sanctions could not be

imposed absent a jury trial. We must now determine whether the district court's sanctions were criminal or civil in nature. [4]

The nature of a contempt "turns on the character and purpose of the sanction" issued in response to the contemptuous conduct. *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir. 1998). Criminal sanctions "are intended primarily to punish the contemnor and vindicate the authority of the court." *Id.* Civil sanctions have two purposes: to coerce compliance with a court order and to compensate a plaintiff. *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 443 (1986). A sanction coerces a defendant when it "force[s] the contemnor to conform his conduct to the court's order." *Terry*, 159 F.3d at 93. Where, as here, a sanction does not compensate the party for an injury caused by the contemptuous act, a sanction is civil only if its purpose is to coerce the contemnor into compliance. *Id.* at 95.[5]

---

[4] Even though the district court stated its intention to issue civil sanctions to coerce the defendant into compliance with the Injunction, the district court's stated purpose is not dispositive of the nature of the contempt. *See Bagwell*, 512 U.S. at 838.

[5] Whether a sanction compensates an injured party becomes irrelevant when "there is no contention that the fines are intended as compensatory" because "those facts are no more indicative of a punitive intent than of an intent to coerce compliance." *Terry*, 159 F.3d at 95.

In *Bagwell*, the Supreme Court delineated the nature of coercion in civil contempts and determined that a hallmark of coercive sanctions was that "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket.'" 512 U.S. at 828 (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)). An opportunity to purge is essential; "[t]hus a flat, unconditional fine totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id.*at 829. "[A] noncompensatory fine is civil, and thus may ordinarily be imposed in the absence of a criminal trial only if the contemnor is afforded an opportunity to purge." *People v. Operation Rescue Nat'l*, 80 F.3d 64, 68 n. 7 (2d Cir. 1996) (internal quotation omitted).

Since *Bagwell*, other courts have applied the opportunity to purge requirement to serial contemnors. In situations similar to the facts in this case— where there is an initial injunction, the injunction was violated, there was a subsequent contempt order that outlined a future *per diem* fee schedule for further violations, there was a subsequent violation of the injunction, and then the contemptuous conduct was purged before the parties appeared before the

19

court—courts have recognized that previous court orders afforded the defendant an opportunity to purge before entry of the contempt order in dispute. *See Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 438 (D.C. Cir. 2010) ("*Salazar*"); *NLRB v. Ironworkers Local 433*, 169 F.3d 1217, 1221 (9th Cir. 1999) ("*Local 433*").[6] Within this context, a court's sanction does not become criminal even if the court does not afford the party an additional opportunity to purge because the sanctions were "prompted by [the] party's previous failure to purge." *Local 433*, 169 F.3d at 1221. To hold otherwise would negate the coercive purpose of prospective fee schedules, and "compliance with laws or orders could never be brought about by fines in civil contempt proceedings." *Id*. (quotation omitted). Recognizing that repeated findings of contempt, with proper notice of daily prospective fees, provides the defendant with an adequate opportunity to purge comports with *Bagwell*'s underlying concern of protecting "the due process rights of parties and prevent[ing] the arbitrary exercise of judicial power." *Bagwell*, 512 U.S at 834.

---

[6] Although many civil contempt cases post-*Bagwell* involve administrative agencies exercising their statutory authority to issue civil sanctions and the *Bagwell* Court confined itself to limiting an Article III court's inherent civil contempt power, *Bagwell*, 512 U.S. at 838, these cases are instructive as to the coercive character of prospective *per diem* fee schedules.

Additional factors illuminate the punitive or coercive nature of sanctions and highlight the concerns connected to a court's exercise of its inherent contempt authority. The sheer size of the sanction is indicative of whether the sanction is intended to punish or to coerce a contemnor and whether there is a "need for the protection of the defendant in the adjudication process." *Terry*, 159 F.3d at 94. Further, a district court's civil contempt power waxes when the contemptuous act occurs in its presence and wanes when the act occurs outside of court. *Bagwell*, 512 U.S. at 833–34. The dangers related to the abuse of judicial authority are of particular concern when the contempt involves "out-of-court disobedience to complex injunctions [because they] often require elaborate and reliable factfinding." *Id.* When the contempt involves a simple disobedient act, however, the "risk of [an] erroneous deprivation from the lack of a neutral factfinder" is diminished, and a court's ability to exercise its inherent civil contempt power is amplified. *Id.* at 834. Determining the purpose of a sanction is a fact-specific inquiry that must be understood in the context of each individual case. *See Terry*, 159 F.3d at 94 (analyzing the purpose of sanctions "in the context of this case"). Within this framework, and considering these factors, we now address the district court's sanctions.

We hold that the district court's sanctions were civil in nature because the purpose of the sanctions was to coerce FilmOn into future compliance. The district court sanctioned FilmOn $90,000 for violating the Injunction. It calculated the sanction amount by using the $10,000 per day fee schedule from the 2013 Contempt Judgment and by fining FilmOn for every day that it had deployed the Teleporter System after Aereo Inc. had ceased deploying its analogous technology. Although the district court's stated rationale is not dispositive of the issue, *Bagwell*, 512 U.S. at 838, the district court here noted FilmOn's repeated disregard for federal injunctions and recognized the heightened importance of ensuring FilmOn's compliance.

As the district court explained, the sanctions were issued in response to FilmOn's repeated violation of the Injunction and similar injunctions throughout the country. FilmOn received notice in the 2013 Contempt Judgment that any further violation of the Injunction would result in daily sanctions. Accordingly, the Fee Schedule was a coercive tool to keep FilmOn in compliance. Once FilmOn disobeyed the Injunction, the district court gave effect to this coercive tool by sanctioning FilmOn. Moreover, the fact that the Injunction will continue to remain in effect further suggests that the purpose of the sanctions was to

ensure future compliance with the Injunction. *See Local 433*, 169 F.3d at 1221 ("[F]ines for completed conduct still have a remedial purpose when the court order remains in place and future compliance is sought."). The district court's "civil contempt powers are particularly adapted to curb recidivist offenders" where future noncompliance is a well-founded concern. *Id.* FilmOn's history of aggressively pushing the bounds of the Injunction and of repeatedly neglecting to petition the district court for clarifications further highlights the sanction's coercive purpose and effect.

The fact that the sanctions were issued after FilmOn had ceased violating the Injunction does not transform them into retrospective, punitive penalties because FilmOn had the opportunity to purge its contemptuous conduct. First, FilmOn violated the Injunction through its dissemination of the VOD service. Then, FilmOn was held in contempt in 2013 and was given notice of the prospective fee schedule, after which it had an opportunity to purge its conduct. FilmOn in fact arguably purged its conduct by deploying the Teleporter System in an attempt to comply with this Circuit's interpretation of the Copyright Act's public performance provision. *See Cablevision* 536 F.3d at 140; *Aereo II*, 712 F.3d at 705. After *Aereo III*, however, FilmOn's use of the technology clearly violated the

Injunction. FilmOn did not come into compliance until nine days after Aereo Inc. had halted its activities. The series of contempt orders, containing notice of daily prospective fines, was followed by a clear violation of the Injunction. FilmOn was afforded an opportunity to purge its conduct after *Aereo III*, but did not do so. *See Salazar*, 602 F.3d at 438; *Local 433*, 169 F.3d at 1221. The district court was not required to give FilmOn an additional opportunity to purge before issuing the sanctions because these fines were prompted by FilmOn's previous failure to purge.

Although the contemptuous behavior occurred outside of the courtroom, the sanctions did not pertain to "widespread, ongoing . . . violations of a complex injunction" and the district court did not have to police FilmOn's "compliance with an entire code of conduct that the court itself had imposed." *Bagwell*, 512 U.S at 837. The injunction was relatively simple, and although copyright law is subject to change, the particular shift in law at issue here could be applied clearly and predictably to FilmOn because its Teleporter System was essentially identical to the technology that was determined to violate the Copyright Act in *Aereo III*. Finally, the sanction totaled $90,000, a relatively minor amount which is not large enough to "warrant concern with the adjudication process." *Terry*, 159

F.3d at 95. This reaffirms our conclusion that the district court's sanctions were civil. The district court did not abuse its discretion when it sanctioned FilmOn $90,000 for failing to comply with the Injunction.

### d. Attorneys' Fees

Finally, FilmOn argues that the district court abused its discretion by awarding attorneys' fees to the appellees. This Court reviews an "award of attorney's fees for abuse of discretion, which occurs when (1) [the court's] decision rests on an error of law… or clearly erroneous factual finding, or (2) its decision cannot be located within the range of permissible decisions." *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 416 (2d Cir. 2010) (internal quotation omitted). In the original 2012 Settlement Agreement the Plaintiffs, FilmOn and David agreed that "[i]n the event of a dispute arising out of or relating to the terms of this [2012 Settlement] Agreement or [the Injunction], the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs." App. 156. The plain language of this agreement allows for an award of attorneys' fees because this matter is related to the terms of the Injunction. We find no abuse of discretion in the district court's award of attorneys' fees.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's decision.